IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joao R. Cota-Robles | ) No. CV 04-643-TUC-RCC (HCE) |
| | ) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| Michael J. Astrue,[1] Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

On November 23, 2004, Plaintiff, through counsel, filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  On that same date, Plaintiff's case was referred to the Honorable Nancy Fiora, United States Magistrate Judge, for a Report and Recommendation pursuant to the Rules of Practice of this Court.  On July 8, 2005 this matter was referred to the undersigned Magistrate Judge in light of Magistrate Judge Fiora's retirement.

Pending before the Court are Plaintiff's Motion to Supplement Transcript and the parties' Cross-Motions for Summary Judgment. For the following reasons, the Magistrate Judge recommends that the District Court grant Plaintiff's Motion to Supplement Transcript, grant in part and deny in part Plaintiff's Motion for Summary Judgment (hereinafter

---

[1]On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as the defendant in this action.

"Plaintiff's MSJ"), and deny Defendant's Cross-Motion for Summary Judgment (hereinafter "Defendant's XMSJ").

I.    PROCEDURAL HISTORY

On October 24, 2000, Plaintiff submitted to the Social Security Administration (hereinafter "SSA") an application for disability insurance.  (TR. 97-99)  Plaintiff indicated he stopped working on September 29, 1999 due to a neck and back injury, continuous pain, and two herniated disks.  (TR. 105)  Plaintiff's application was denied as was his request for reconsideration.    (TR. 66-69, 75-78) Plaintiff then requested a hearing before an administrative law judge (hereinafter "ALJ") but such request was denied as untimely by ALJ Norman R. Buls.  (TR. 91, 58-65) Plaintiff sought review by the Appeals Council of the ALJ's order denying Plaintiff's request for a hearing.  (TR. 82) The Appeals Council vacated the ALJ's order and directed the ALJ to provide Plaintiff "an opportunity for a hearing."  (TR. 85; *see also* TR. 84)

Thereafter, Plaintiff amended his application to request a closed period of disability dating from September 29, 1999 through February 10, 2003.  (TR. 94-95)

The matter came on for hearing on November 13, 2003 before ALJ Buls.  (TR. 30-55) Plaintiff, represented by counsel, was the only witness to testify.  (Id.) On December 10, 2003 the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (TR. 15-22)

Plaintiff sought review by the Appeals Council of the ALJ's decision.  (TR. 10-11) On September 24, 2004, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's December 10, 2003 decision the final decision of the Commissioner. (TR. 5-8)  On October 18, 2004, Plaintiff submitted additional argument and evidence for the Appeals Council's review.  (Plaintiff's Motion to Supplement Transcript) On November 23, 2004, Plaintiff initiated the instant action.

II.    THE RECORD ON APPEAL

    A.    Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on April 9, 1968. (TR. 33) On the alleged onset date of September 29, 1999, Plaintiff was 31 years of age. Plaintiff testified that he is married and lives with his wife. (TR. 33-35) He has two minor children from a previous marriage and the children live with his ex-wife. (Id.)

Plaintiff completed high school and two years of college. (TR. 34) Since 1995, he has installed sheet metal, such as duct work, for a living. (TR. 106) His prior employment includes "phone room" manager (1994-1995) sheet metal installation (1992-1994), delivery driver for a bread company (1991-1992), bartender (1988-1990), sheet metal installation (1986-1987). (TR. 106, 121) Plaintiff described these jobs at the hearing and in work history reports. (TR. 45, 118-123)

At the time of Plaintiff's injury, he had been working since 1995 for a sheet metal company where his duties included  installation of duct work that weighed "300, 400 pounds–the corner of the unit that you would lift...it would be 1,600 pounds total. The hardest part was putting up runs of duct work where you're working over your head and having to hold them up and attach a strap..." (TR. 44-45, 106) Plaintiff was initially injured at work on June 17, 1999 when he was using a lift to push up between 250 and 300 pounds of duct work over his head, the duct work broke free, struck him, knocked him backwards and pinned him over the scissors lift. His head and neck were bent backward over the lift and the duct work landed on his chest. (TR. 45, 94) After the June 17th incident, Plaintiff returned to work in a light duty position because of pain: "they had taken me out of actually installing duct work and made me more of a supervisor...a foreman." (TR. 47; *see also* TR. 130)   While working as a foreman on September 29, 1999, Plaintiff "was guiding...a forklift...so some roof curbs [sic] could be sent up over a parapet wall." (TR. 47) One of the "cribs", which weighs "about 100 pounds" began to fall. (Id.) Plaintiff reached up to "push the roof crib back onto the forklift" to prevent it from falling on the other workmen and in

doing so Plaintiff aggravated his previous injury "to a point where I couldn't continue" working.  (Id.)

After September 26, 1999, Plaintiff felt more pain than he had ever experienced before, "it was on the right side of my neck and over my trapezius muscle, down my right arm, from the middle of my shoulder blades about mid-back up, and it hurt drawing a breath. I certainly couldn't raise my arm over my head.  It was constant."  (Id.) Plaintiff also experienced numbness in his lower pack and periodic pain as if his back had gone out.  (TR. 48) The periods when his low back "went out" would last about five days and Plaintiff was confined to bed.  (Id.)  "But then it would heal.  I would feel better though the pain and aggravation in [sic] lower back would go away, and I would be able to continue my day even though my upper back [sic] the pain was constant, and I felt it all the time."  (Id.)  Plaintiff described the constant pain he experienced as radiating "from my back and neck to my right shoulder and arm."  (TR. 126)  Plaintiff attempted a work hardening program, but that did not help.  (TR. 48)

In 2000, Plaintiff attempted to work as a phone solicitor, however. he was only able to work in that position for three weeks because he could not "maintain the seated position for the length of time" and it was difficult for him to look at a computer screen.  (TR. 40, 42) The weight of his head felt heavy on his neck and he had "to be able to lay back...to get some relief.... And, I wasn't able to do it" and still meet his call quota.  (TR. 42) Because Plaintiff "wasn't able to get up" or change position his injury became more aggravated throughout the week.  (Id.)  "It wasn't like I was going home and getting relief.  Once my injury was aggravated it would continue and then I would end up missing a day as a result....Missing a day, I believe, at least every week and then at the end of three weeks...I had to return to the doctor in a soft collar, because my neck was hurting so badly."  (Id.)  Plaintiff's upper neck area, shoulders and upper back area hurt "24 hours a day, constantly."  (TR. 43)

In the weeks prior to Plaintiff's June 1999 injury, Plaintiff qualified for a pro bowler's tour.  (TR. 46) He has been unable to bowl since his injury.  (Id.)  Although he had been an

avid golfer, he has been unable to golf since his injury. (Id.) He has been unable to continue coaching his children's baseball team or throw them balls at batting practice. (Id.) He is also unable to dance. (Id.) His injury has kept him from doing the things that he enjoys. (TR. 130)

During the period of disability, Plaintiff could walk approximately 15 or 20 minutes on a flat surface and approximately 100 yards on an incline. (TR. 52) He could sit in a chair for approximately 30 minutes at a time. (TR. 48-49) He was unable to sit through a movie without getting up periodically and walking around. (TR. 49) He was unable to stand for a long period during his children's baseball games. (TR. 51) Instead, he would have to alternate between standing and sitting and "couldn't remain in either position. And, it's painful to do both..." (Id.) Raising his hands over his head worsened the pain which often happened when he shampooed or brushed his hair. (TR. 53, 129) He needed to rest every two hours and on bad days he needed to rest every 45 minutes. (TR. 49-50) It hurt to bend over and he had difficulty putting on his socks. (TR. 50) Once his condition is aggravated, "it continues to stay aggravated for at least 24... to 48 hours in my upper back." (TR. 53) During the periods of aggravation, "on a zero to ten scale, zero being no pain, ten being the worst pain...", Plaintiff rated the pain a ten. (TR. 53)

Because of difficulty sleeping, he could sleep for only 45 minutes at a time. (TR. 50) He took several medications that made him feel "foggy." (Id.) At one point, he asked to be taken off of neurontin, a pain medication, because it affected his short-term memory. (Id.) At times, the medication impaired him in such a way that he was unable to drive. (TR. 50-51)

During the period of disability, Plaintiff lived by himself, rose at approximately 6:00 a.m., attended physical therapy from 7:00 a.m. to 1:00 p.m., returned home to place himself in traction, take naps and generally find a comfortable position. (TR. 128) He had difficulty in the shower as he had little mobility in bending, reaching and twisting. (Id.) He did his own cleaning in short periods. (TR. 39) While he could vacuum, he was unable to mow the lawn.

(Id.)  He could only carry out the garbage if it were half full; he could carry a gallon of milk but he had to use a cart to carry a gallon of milk and a two liter bottle; and he could not carry any significant amount of weight for a long period of time.  (Id.; TR. 51; *see also* TR. 129 ("I can't carry very many things from my car..."))   He could only drive for 30 minutes at a time and he would have to walk around afterwards.  (TR. 39, 49)  He spoke to friends and family on the phone daily.   (TR. 129)  During the period of disability, Plaintiff  received workman's compensation.  (TR. 35)

Since February 2003, Plaintiff has been working for a relative as a customer service representative at a custom publishing business.  (TR. 36)  He answers phones, directs calls, does invoicing, and is in charge of accounts receivables.  (Id.) He does no field work, is able to frequently change positions, and is permitted to take breaks when needed.  (TR. 37) He would not have been able to perform this job during the period of disability because at that time he could not sit or stand for long periods and he is now using a morphine time-release system that distributes the drug over a 24 hour period which helps ease his constant pain.  (TR. 37) Additionally, his employer, who is his cousin, understands his physical difficulties and allows him to adjust position as needed and to miss work.  (TR. 37, 52) His medication no longer makes him feel foggy.  (TR. 50) Plaintiff attributes his ability to work since 2003 to wide latitude in his job to take breaks and change position, improvement in his condition, physical therapy courses, muscle relaxers, and the time-release morphine.  (TR. 37) Plaintiff stated that there was no 24-hour period between September 1999 and February 2003 that he was without back or neck pain.  (TR. 53)

     B.     Medical Evidence

          1.     Plaintiff's Physicians

Hospital reports dated June 17, 1999, the day of Plaintiff's initial injury, reflect that Plaintiff presented complaining of pain to mid-back area.  (TR. 193) X-rays revealed "mild anterior compression fracture of T12 of an indeterminate age" at the thoracic spine and "mild degenerative changes at C3-C4  with moderate bilateral neuroforaminal narrowing" at the

cervical spine.   (TR. 193; *see also* TR. 257)  The diagnosis was: "thoracic anterior compression fracture secondary to trauma."  (TR. 193)  Plaintiff was directed to stay off work until June 22, 1999, to follow up with the Tucson Orthopedic Institute, and was prescribed ibuprofen 800 mg., flexeril, and percocet.  (Id.)

On June 19, 1999, Plaintiff presented at a hospital emergency room complaining of back pain.  (TR. 203)  Plaintiff's discharge diagnosis was C6-C7 herniated disc and he was given demerol and phenergan.  (Id.)

A June 21, 1999 report by Stephen L. Curtin, M.D., reflected that Plaintiff complained of continued pain.  (TR. 363)  Dr. Curtin's exam revealed that Plaintiff was not in acute distress, could stand straight, had full range of motion in his arms and shoulders, had full motion of his upper extremities and lower extremities, had a normal gait, was "a little hypokyphotic in the mid thoracic," and was "point-tender right between the shoulder blades in the midline on the spine."  (Id.)  When reviewing the June 17, 1999 spinal X-rays, Dr. Curtin indicated that Plaintiff "has a little scoliotic deviation and minimal rotation.  It is hard to tell whether this is old or new, but I can't appreciate anything being fractured or dislocated."  (Id.)  Dr. Curtin's impression was: "Contusion to the thoracic spine, mid-thoracic region."  (Id.)  Dr. Curtin decided to treat Plaintiff "conservatively with analgesics" and recommended exercises.  (Id.)  He "suspect[ed]...a self-limiting condition."  (Id.)

On July 8, 1999, Plaintiff returned to the hospital complaining of increased back pain that "goes from his shoulder blades all the way up the soft tissues of his shoulder, into his neck and into the back of his head causing his right arm to have numbness and...vision...problems."  (TR. 189)  He was out of percocet and he stated that naprosyn made his stomach hurt and flexeril made him groggy.  (Id.)  Physical examination revealed that his cervical spine was not tender, his thoracic spine was slightly tender between the shoulder blades going to the right. (Id.)  The attending physician, Raquel Gibly, M.D., diagnosed back muscle pain and spasm.  (TR. 190)  She prescribed toradol and valium which made him feel

better "with no pain."  (Id.) Dr.  Gibly reviewed Plaintiff's "old chart and his records and his C-spine films were not acute.  His T-spine films did show the T-12 fracture."  (Id.)

Plaintiff returned to the hospital in August 1999 complaining of back pain between his shoulder blades which made it difficult to take a deep breath.  (TR. 186) The assessment was back strain.  (TR. 186) He was advised to rest and follow physical therapy instructions. (Id.)

A September 1, 1999 X-ray of Plaintiff's thoracic spine showed what "may be a mild curvature of the spine" and mild discogenic degenerative changes.  (TR. 185, 256) Catherine Metzger-Rose, M.D., who dictated the report, noted that "[u]nfortunately, the spinous process is the lowest and the mid thoracic region are not included on the films."  (TR. 185, 256) Her impression was that "[t]he study is somewhat limited for spinous process...No significant change since 6/17/99.  (Id.)

A September 13, 1999 exam by Nick Mansour, M.D., indicated Plaintiff's complaints of back pain between shoulder blades, soreness at the lower back, and pain on breathing. (TR. 241) Dr. Mansour's records throughout September 1999 reflected Plaintiff's continued complaints of neck pain.  (TR. 240)

An October 14, 1999 MRI of Plaintiff's thoracic spine reflected:

Central disc bulging and/or osteophyte is present at T1 through T10 levels.  A small annular tear is present at the T8-9 level.  Multilevel mild spinal canal narrowing is produced but with no impingement on the spinal cord.
***
1.      Degenerative disc disease and multilevel disc bulging/osteophyte in the thoracic spine.  No cord compression is seen.
2.      No evidence of diskitis or bone marrow edema.

(TR. 158; *see also* TR. 258)

On October 25, 1999, Dr. Mansour noted that Plaintiff felt he could not return to work because he was still in pain.  (TR. 240) Dr. Mansour also noted that the MRI showed disc bulges, no diskitis and no herniation.  (Id.)

Additionally, in October 1999 Plaintiff  underwent a "whole body bone scan"  which showed "[p]robable healing fracture left 9th posterior rib."  (TR. 182)

On January 25, 2000, Plaintiff saw Jack Dunn, M.D., upon Dr. Mansour's referral for a neurosurgical evaluation. (TR. 229) Plaintiff complained of constant pain in his back between his shoulder blades. (Id.) The pain is worse on the right than the left and travels up his neck. (Id.) Plaintiff also complained of dysesthesias and reported a 48 pound weight gain–from 250 pounds to 298 pounds which Dr. Dunn indicated was obese. (Id.) Dr. Dunn found that Plaintiff had "no sensory deficit to touch. Pinprick." (Id.) Plaintiff was able to stand, walk and balance, and had full range of motion in his neck. (TR. 230) According to Dr. Dunn, Plaintiff had "tenderness and a lot of pain, subjective complaints." (Id.) Because Plaintiff's complaints were cervical in nature, Dr. Dunn recommended an MRI scan of the cervical spine. (Id.)

On January 30, 2000, Plaintiff presented to the hospital complaining of back pain in his lower back and shoulder blades and symptoms consistent with a previous duodenal ulcer. (TR. 176) He was also out of percocet. (Id.) On physical examination, Plaintiff had upper thoracic spine pain, mostly on the right between the scapula; full range of motion in his neck without any significant increase in pain; and demonstrated normal strength and sensation in his upper extremities. (TR. 176) The assessment was viral gastritis and chronic pain and in addition to medication for gastritis, Plaintiff was prescribed percocet. (TR. 177)

 A February 2, 2000 MRI of Plaintiff's cervical spine indicated "[d]egenerative disk disease with some spondylotic ridging, a mild degree of canal stenosis, and presence of right-sided disk protrusion at the C6-C7 level. No evidence of spinal cord complication." (TR. 159) The MRI findings included the "presence of lateral disk protrusion on the right side extending into the neural foramen and thus affecting the exiting C7 root." (Id.)

On February 1, 2000, Dr. Mansour indicated that Plaintiff was unable to perform his normal work activities from February 1, 2000 through March 1, 2000 and could return to work thereafter. (TR. 237) On that same date, Dr. Mansour prescribed percocet. (Id.)

On February 9, 2000, Dr. Dunn reported that Plaintiff's MRI scan showed "a small herniated disc on the right side. That may be giving his right-sided symptoms." (TR. 228)

Thereafter, on February 29, 2000, Dr. Dunn saw Plaintiff and reported Plaintiff's complaints of pain in the right neck radiating to the right shoulder and pain on the left side, too.  (TR. 227) Additionally, Plaintiff experienced dysesthesias of the hand on the right side. (Id.)  Dr. Dunn stated that Plaintiff had a herniated disc at C6-7 on the right side "that is giving him a lot of his complaints; mainly pain in the right neck radiating to the right shoulder."  (TR. 227) Dr. Dunn explained to Plaintiff that "because he has no significant weakness or reflex changes that the sensory changes may never change."  (Id.) Dr. Dunn noted that "[s]urgery may not improve any of his symptoms..." and recommended a pool program with physical therapy.  (Id.)

Physical therapy notes from March 2000 indicate that Plaintiff was diagnosed with a T6 ruptured disk. (TR. 162) The assessment denoted that Plaintiff had decreased range of motion and pain in the cervical and thoracic spine in addition to "decreased tolerance to static postures or exercise."  (TR. 162-163) Pool exercises were recommended which Plaintiff began that same month.  (TR. 163-170) During the course of physical therapy, Plaintiff continued to complain of back pain and numbness in his extremities.  (TR. 167) In April 2000, the physical therapist noted that although Plaintiff "was very compliant," he continued to experience pain and his "neck disability score" increased. (TR. 161)

Dr. Dunn's progress notes dated June 15, 2000 reflect that Plaintiff "is having a large herniated disk at C6-7 giving him pain radiating into the right shoulder, arm and hand.  He says things are getting worse...He may need to have surgery."  (TR. 226) On June 19, 2000, when Plaintiff complained about increased pain and shoulder weakness, Dr. Dunn noted that "[t]he neuroradiologist, Dr. Komar,[2] reported an extruded fragment.  That disk is at the C7 area and explains his symptoms."  (TR. 225) Dr. Dunn recommended another MRI scan and that Plaintiff stop using narcotic pain killers.  (Id.) On June 20, 2000, Dr. Dunn noted that

---

[2]Dr. Komar issued the report on Plaintiff's February 2, 2000 MRI.  (TR. 159)

Plaintiff's "MRI scan did not look so bad as it did before."  (TR. 224) He decided to reexamine Plaintiff to "see if he is going to need surgery."  (Id.)

Results of a July 5, 2000 EMG nerve conduction study denoted: "*Absent* right radial H reflex which could be consistent with C6 or C7 radiculopathy."  (TR. 217) (emphasis in original) Dr. Dunn also noted that the results of the EMG nerve conduction study "were basically normal except for an absent ankle reflex on the right side.  That could be a C6 or C7 radiculopathy."  (TR. 223)

On July 17, 2000, Plaintiff reported to Dr. Dunn that he had a lot of neck pain and pain between his shoulder blades, "[h]is trapezius muscles are all sore and stiff", and extending his neck caused pain to radiate down his right arm.  (TR. 216) Dr. Dunn noted that Plaintiff's "MRI  scan was not that impressive.  He does have a disk at 3-4.  He does have a disk at 4-5 and also at 6-7.  The 6-7 disk is on the right side, but it is not as bad as I would expect.  Certainly, he has a radiculopathy."  (Id.) Dr. Dunn found that Plaintiff's strength was normal, he had no vascular problems, and that there was no evidence that the cervical spine was the cause of Plaintiff's complaints of pain and numbness in his right leg.  (Id.) Dr. Dunn recommended that Plaintiff see Dr. Goldfarb for a second opinion.  (Id.)

On August 14, 2000, Robert Goldfarb, M.D., a neurosurgical consultant associated with Dr. Dunn, saw Plaintiff upon Dr. Dunn's "request for a second neurosurgical opinion." (TR. 208; *see also* 344-345) Dr. Goldfarb noted Plaintiff's complaints of pain between the shoulder blades, at the top of his right shoulder, down into the right arm, numbness in the right forearm and fourth and fifth fingers, and that his right leg "goes 'dead' when he lies on his back."  (TR. 208) Dr. Goldfarb reported that Plaintiff weighed over 300 pounds; had normal strength and reflexes; and Plaintiff complained of a decreased sensation to pinprick to his fourth and fifth fingers.  (TR. 209.) Dr. Goldfarb also noted that Plaintiff's range of motion of his neck did not "seem to reproduce a true radicular pain today; however, it increases the discomfort over the posterior cervical area and interscapular region."  (Id.) Upon review of Plaintiff's June 19, 2000 MRI, Dr. Goldfarb concluded that although Plaintiff

had "a mild central and right-sided disk protrusion at C6-7 with mild indentation of the thecal sac", he did "not see a significant nerve root compression." (Id.) Dr. Goldfarb recommended that Plaintiff undergo a trial of physical therapy to include "vertical cervical traction with a physical therapist who is familiar with my routine." (Id.) Although Dr. Goldfarb was reluctant to suggest surgery, he did not rule out that possibility. (Id.)

In September 2000, Plaintiff returned to Dr. Dunn for a follow-up. (TR. 215) Dr. Dunn noted that Plaintiff "continues to have evidence of a cervical radiculopathy and severe pain." (Id.) Dr. Dunn could not find "a significant deficit at this point." (Id.) Plaintiff did not exhibit atrophy or weakness, "just a sensory deficit. He has pain on flexing the neck and tilting, twisting, or turning to the right." (Id.) Dr. Dunn recommended that, instead of "attempting any surgery on that damaged disc", Plaintiff should begin a work back program starting with flexibility and strengthening exercise, and he prescribed vioxx. (Id.) Also in September 2000, Dr. Dunn's office indicated that percocet would no longer be prescribed for Plaintiff. (TR. 236)

On October 3, 2000, Dr. Dunn noted that Plaintiff was uncomfortable but did not need any medications now. (TR. 214) A few days later, Plaintiff began physical therapy. (TR. 213) Physical therapy records throughout October 2000 indicate that Plaintiff was performing at a light work category and that home cervical traction provided temporary relief for a few hours. (211-212) Although Plaintiff increased the range of motion of his neck, he still experienced right C-spine pain with certain neck movements, including extension. (TR. 211) A November 14, 2000 discharge summary from physical therapy denoted that Plaintiff had attended 28 sessions and continued to experience pain associated with the following cervical spine activities: rotation, bending, forward flexion and cervical extension. (TR. 354) The physical therapy team recommended Plaintiff's discharge from the Work Fitness Program:

> secondary to increased symptoms with attempts at work simulation task, especially overhead activity, which is quite frequent in his occupation. He also has not demonstrated an ability to sit more than 30 minutes continuous without change of position. He has a home cervical traction unit from which he reports near immediate relief for 2+ hours and then pain returns.

(Id.)  Plaintiff was currently performing at a light-medium work category.  (Id.)

On November 16, 2000, Dr. Dunn noted that Plaintiff continued to have pain on the right side of his neck, had completed a rehabilitation program, and "is really maxed out at a light-medium work level."  (TR. 342)  Dr. Dunn opined that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; and can walk, stand, push, pull, use arm and leg controls sitting or standing.  (Id.)  Dr. Dunn stressed that Plaintiff could not perform medium, medium-heavy, heavy or very-heavy work.  (Id.)  Dr. Dunn recommended that Plaintiff see Dr. Prust or Dr. Bhola at the pain center for steroid epidural injections; continue cervical traction at home; and stay as active as possible.  (Id.)  "After the epidural, I will be able to declare him medically stationary with the probable maximum medical improvement and probably a partial permanent disability of 7% requiring pain clinic care."  (Id.)

On November 16, 2000, Dr. Mansour, completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" beginning apparently in 1999[3]  through June 5, 2000.  (TR. 232-233)  Dr. Mansour indicated that Plaintiff had no lifting or carrying restrictions; could stand and/or walk 6 hours in an 8-hour workday; he could sit 6 hours in an 8-hour workday; and had no postural limitations.  (Id.)  Dr. Mansour based his statements on his exam of Plaintiff.[4]  (TR. 233)

On January 11, 2001, Plaintiff saw Randall Prust, M.D., for pain management  upon referral from Dr. Dunn.  (TR. 244-245)  Dr. Prust noted that he had seen Plaintiff previously in December 2000 and he administered an epidural steroid injection at that time which provided Plaintiff with slight relief.  (TR. 244-245)  At his January 11, 2001 appointment with

_____

[3]The precise beginning date for the period covered by Dr. Mansour's assessment is illegible.  (TR. 233)

[4]Defendant indicates that Dr. Mansour's findings were made "after an 'extensive skeletal' examination." (Defendant's Statement of Facts, p. 10 (citing TR. 232-233))  However, Dr. Mansour's comments contained in the Medical Source Statement  reflect that Plaintiff's "exam appears normal...extensive skeletal exam...not done" (TR. 233) and "exam not revealing although not extensive."  (TR. 232)

Dr. Prust, Plaintiff stated that he was taking 4 percocet a day and pamelor.  (TR. 244) Dr. Prust's impression denoted: cervical herniated disc, cervical radicular syndrome, and occipital neuralgia.  (Id.) Dr. Prust administered another cervical steroid epidural and Plaintiff's "pain was improved following the block."  (TR. 245) In February 14, 2001, Plaintiff reported to Dr. Prust that for two weeks following his January 11, 2001 injection, "he was almost completely better", was able to reduce his medication, and engage in "more normal activities.  Unfortunately, in the last few weeks, the pain has come back. He is still about 10% better overall but certainly nothing like he would like to be." (TR. 254) Dr. Prust administered another cervical steroid epidural at the February 2001 appointment.  (TR. 254-255) Dr. Prust also recommended that Plaintiff receive injections up to six times once he is stable and stationary, "[h]e certainly is not at this point yet, however.  He still may require surgery, and I do not want to say that is not an option.  Hopefully, this last epidural, however, will give him many months of relief."  (TR. 255)

On June 18, 2001, Dr. Dunn wrote to Dr. Mansour that Plaintiff had returned complaining of pain in the neck and right shoulder.  (TR. 341) Dr. Dunn indicated that he had not seen Plaintiff in a while and that Plaintiff had been getting pain injections.  (Id.)  Dr. Dunn's examination reflected that Plaintiff exhibited "give-way in the motor examination", full range of motion in the neck, no atrophy, no drift, good range of motion of the shoulders, neck, elbows, wrists, hands and fingers, and Plaintiff is able to walk and stand.  (Id.) Dr. Dunn also indicated that Plaintiff "has a very unusual sensory deficit involving the ulnar surface of the ring finger...and little finger" otherwise Plaintiff exhibits no sensory deficit. (Id.) Dr. Dunn was "a little suspicious of his behavior because of the extreme pain" and indicated that if Plaintiff continues to have "give-way weakness we will give him a fairly normal rating."  (Id.) Dr. Dunn ordered further testing.  (Id.)

Results from a July 27, 2001 EMG nerve conduction study, interpreted by Dr. Goodman, included:

> Absent right radial H-reflex, as seen on previous EMG 7/5/2000.  Normal needle EMG right arm and bilateral cervical paraspinals.  The absent H-reflex is consistent with right C6 or C7 radiculopathy.  No active denervation at this time.

(TR. 259) Dr. Dunn's August 28, 2001 note regarding the EMG nerve conduction study, denoted that the tests, "other than an absent right radial H-reflex, were normal.  Without any nerve damage or muscle changes, I am real pleased."  (TR. 340) He concluded that Plaintiff would not benefit from surgery.  (Id.)

On October 2, 2001, Plaintiff returned to Dr. Dunn complaining of pain and that during a recent independent medical examination the doctors had hurt him.  (TR. 339) Dr. Dunn did not examine Plaintiff "because I think it would cause more pain than I would be able to learn anything."  (Id.) Testing thus far revealed "signs of an old C6 radiculopathy, nothing new or progressive, no denervation or anything else."  (Id.) Dr. Dunn ordered additional testing and recommended an active exercise program.  (Id.)

In late January of 2002, Dr. Dunn wrote to Dr. Mansour that Plaintiff was complaining of a new symptom relating to his upper left extremity including dysesthesias in some of his fingers, limited range of motion due to discomfort, and inability to lift, carry, move, or walk without having pain.  (TR. 338) Dr. Dunn recommended X-rays of Plaintiff's cervical and lumbar spine and a gentle walking and pool program.  (Id.)

On February 20, 2002, Plaintiff returned to Dr. Prust.  (TR. 350) Prior to this visit, Plaintiff had received a total of six epidural injections from Dr. Prust since December 2000.  (Id.) Dr. Prust noted that Plaintiff's chief complaint was: "right-sided neck pain with numbness that goes down the C6-7 distribution on the right side.  He also gets chronic headaches, but this has improved with the epidurals."  (Id.) On physical exam, Dr. Prust determined that Plaintiff had limited range of motion in his neck, which had decreased since his last exam and was tender to palpation, although Dr. Prust detected no spasms. (TR. 351) Plaintiff also had decreased strength in his right arm and marked tenderness over the right occipital nerve and groove, "and when you tap on this, this does create a lightening type pain

that goes into the head." (TR. 351) Dr. Prust concluded that Plaintiff was stable and stationary given that Plaintiff did not wish to pursue surgery and agreed with Dr. Dunn's conclusion that Plaintiff had a 7% permanent impairment secondary to the June 17, 1999 injury. (TR. 352) Dr. Prust based his conclusions on Plaintiff's "loss of range of motion and nonverifiable radicular complaints. He also had a disc protrusion/herniated disc consistent with his symptoms on that right side." (Id.) Dr. Prust administered a cervical steroid epidural injection that day and recommended that Plaintiff receive such injections 4-6 time per year along with medications. (Id.) Dr. Prust further indicated that Plaintiff could work with certain restrictions,[5] and that he should start out working 4 hours per day with a gradual increase to full-time status as tolerated. (TR. 353) "I believe that with the combination of medications and cervical steroid epidurals, that he should be able to continue with gainful employment." (Id.)

When he saw Dr. Dunn again on May 9, 2002, Plaintiff was wearing a cervical collar which he said provided some relief. (TR. 337) Plaintiff complained of neck pain and numbness in his right little finger. (Id.) He had moved to Chandler, Arizona, and was seeking treatment from Angela Merzenich, M.D. (Id.) Dr. Dunn did not "have any neurosurgical recommendations that would benefit him. He had signs and symptoms of a C7-C8 radiculopathy but no concrete evidence to back that up." (Id.) Dr. Dunn recommended that Plaintiff seek further treatment in Chandler to avoid the long drive to Tucson. (Id.)

A June 6, 2002 MRI of Plaintiff's cervical spine showed:

1. Mild right paracentral disc protrusion at the C6-7 level associated with mild right ventral cord flattening.
2. Mild cervical spondylosis at other levels as described.
3. No intrinsic abnormality of the cervical spinal cord.

(TR. 264) This MRI was unchanged since the exam dated June 19, 2000. (Id.)

─────────────────

[5]These restrictions do not appear in the record nor does either party cite them.

On August 30, 2002, Daniel M. Lieberman, M.D., a neurosurgeon, examined Plaintiff upon referral from Dr. Merzenich.  (TR. 313) Notes from his exam reflect that Plaintiff had reduction in sensation in the right C8 distribution and along the whole arm.  (Id.) He also noted that Plaintiff's MRI showed "cervical spondylosis with extremely small disc bulging at multiple levels."  (Id.) Dr. Lieberman had a "hard time assigning a specific organic pain generator to this case."  (Id.) He opined that Plaintiff was not likely to benefit from surgery. (Id.) He recommended "medical management and given the neurological nature of the complaint, it will probably be either a tricyclic antidepressant or an antiepileptic medication." (Id.) Dr. Lieberman disagreed with the use of narcotic drugs and referred Plaintiff to Candyce Williams, M.D., for further treatment.  (Id.)

Dr. Williams' September 16, 2002 exam notes reflect that Plaintiff was tender upon palpation in the cervical spine, the upper trapezius area, and levator scapula bilaterally but more pronounced on the right; the rhomboids had some soft tissue tightness with trigger points, neck flexion, extension and lateral bending were full;  motor strength was normal; and Plaintiff had decreased pinprick sensation along the right C8 distribution. (TR. 311) Plaintiff told Dr. Williams that he experienced pain at 6 to 7 on a scale from 1 to 10; he could not sit or walk for long periods; carrying 2-liter bottles exacerbated his pain; he had difficulty sleeping; he was able to drive; he used cervical traction three times per day; and the epidural blocks provided the most effective relief. (TR. 309-310) Dr. Williams recommended physical therapy and that Plaintiff take Neurontin, which she hoped would diminish his need for percocet.  (TR. 311) When Plaintiff saw Dr. Williams again on October 2, 2002, he reported that the neurontin "has decreased his pain from his previous 6-7/10 to presently 5/10. It [sic] continues to have a stabbing sensation and is aggravated with movement.  He states that he can have decreased pain for 6 hour intervals."  (TR. 308) Plaintiff initially experienced memory problems when he started taking the neurontin but that was later resolved.  (Id.) Dr. Williams also noted that Plaintiff has a history of neck pain with C8 radiculopathy.  (Id.)

A cervical spine MRI dated March 26, 2003, showed:

- 17 -

1.  At C5-6 there is a mild left lateral disc protrusion causing marked narrowing to the left neural foramen.  This appears new from the previous examination.[6]

2.  At C6-7 there is a right broad-based paracentral mild disc protrusion indenting the thecal sac.  This does not appear significantly changed from the prior study.

3.  Mild degenerative disc changes and spondylosis at C5-6.

(TR. 266-267) An October 2003 MRI of Plaintiff's lumbar spine showed "multilevel degenerative disc changes.  Most prominent disc protrusion L3-4 causing central and neural foraminal stenosis."  (TR. 302)

The record reflects that Plaintiff continued to receive cervical steroid epidural injections in 2003 after returning to work.  (TR. 268-273, 282-283) Additionally, in 2003 Plaintiff participated in physical therapy but his pain did not improve (TR. 286-287), he reported a 50-pound weight loss due to dieting. (TR. 274-279, 306) and worsening low back pain with diminished range of motion in that area.  (TR. 304-305)

Plaintiff seeks to supplement the record with a September 15, 2004 Medical Work Tolerance Recommendations form for the period September 16, 2002 through October 2, 2002, completed by Dr. Williams and based upon her 2002 examination of Plaintiff. (Plaintiff's Motion to Supplement Transcript) Dr. Williams opined that Plaintiff could work up to 4 hours per day; could stand for 15 minutes at one time and should not stand for more than 2 total hours per day; could sit for 20 minutes at one time for no more than 2 total hours per day; could walk for 10 minutes at one time without resting, but no more than 2 total hours; needed to change positions frequently; could not climb ladders or stairs; should avoid bending, crouching, kneeling, squatting, sitting in a clerical position, and reaching above shoulder level; could occasionally work with his arms extended in front; could occasionally grip, push, pull, pinch, feel, touch, and type; and should avoid extreme heat and cold, sudden temperature or humidity changes, exhaust fumes, dust, smoke, strong orders, unprotected

---

[6]The "previous examination" was the June 6, 2002 study.  (TR. 266)

heights and moving machinery.  (Id.)  Although the form invited input specifically for driving restrictions, Dr. Williams did not indicate such a restriction.  (Id.)

### 2.        Independent Medical Exams (non-treating physicians)

On April 24, 2000, Plaintiff underwent an independent medical evaluation performed by Lloyd Anderson, M.D.  (TR. 196-201) Plaintiff complained of constant pain in the interscapular area; numbness in his right upper arm extending to the fourth and fifth fingers; numbness in his right leg; headaches in the back of his head and neck; and general weakness in his forearms due to discomfort between his shoulder blades. (TR. 197) Plaintiff stated that his symptoms increased with any length of time staying in one position such as sitting and standing, therefore, he needed to change positions frequently; twisting and turning aggravated his symptoms; and he used percocet one tablet three to four times daily.  (TR. 197)

During the examination, Dr. Anderson noted tenderness to palpation and percussion at the T5-6 level on the midline; tenderness in the right rhomboids, no spasm detected; complaints of pain during exam of Plaintiff's neck and reduced range of motion; Plaintiff walked with a normal gait; Plaintiff had a normal grip strength, good muscle tone, and no atrophy.  (TR. 198-199) Dr. Anderson also reviewed Plaintiff's medical records, including the February 2000 MRI.  (TR. 199) Dr. Anderson's interpretation of the MRI included: "[c]ontusion in mid thoracic area causally related to industrial injury 6-17-99, resolved. Cervical spondylosis with low grade disc protrusion right central C6-7 not casually related to the industrial injury 6-17-99, stable and stationary." (Id.)  Dr. Anderson opined that "[t]he alleged compression fracture of the thoracic spine was not supported by the MRI scan of the thoracic spine"; "changes on his MRI scan are relatively minor and do not appear to be involving the C8 nerve root whatsoever"; and "changes at C6-7 are probably clinically insignificant and are not related to his symptoms even though they may be slightly more prominent on the right than on the left" and the changes did not account for Plaintiff's right lower extremity symptoms.  (TR. 200)

Dr. Anderson found Plaintiff's right upper extremity symptoms, which did not occur until six to seven months after the June 1999 accident, were not related to that accident. (Id.) He recommended that before surgery, further testing should be performed, including a "CT scan of the cervical spine to clarify changes at the C6-7 level" and an EMG "to investigate C8 radicular symptoms." (Id.) Dr. Anderson also recommended that Plaintiff lose weight, as he was markedly overweight, and should seek general body conditioning. (Id.) "Insofar as the industrial injury of 6-17-99 is concerned, I feel he is stable and stationary and requires no further active treatment.  He has sustained no permanent impairment due to this industrial injury and, based on this industrial injury alone, can return to all activities he was performing prior to the industrial injury without limitation causally related to it." (TR. 200-201) Thereafter, in May 2000, Dr. Anderson indicated that his review of additional medical records from 1999, a January 2000 emergency room report, and March and April 2000 physical therapy reports did not change his April 24, 2000 opinion. (TR. 359-360)

On June 30, 2000, Plaintiff underwent an independent medical examination, performed by Mark Frankel, M.D., an orthopaedic surgeon, at the request of Liberty Mutual Insurance Company. (TR. 205-207) On physical examination, Dr. Frankel determined that: Plaintiff had a normal gait; his back moved through a full range of motion; Plaintiff was overweight; his neck moved "through a full range of motion with side bending, rotation, and flexion, but he extends to 0 degrees, will not hyperextend, and complains of pain at 0 degrees, or neutral"; with compression of the cervical spine, he complained of pain; he had some weakness of the right hand; he had some decreased sensation to the pinwheel at the ring and small fingers; and Plaintiff's grip weight was 90 pounds on the left which is dominant and 50 pounds on the right. (TR. 206-207) Dr. Frankel opined that the T-12 compression fracture observed when Plaintiff was injured in June 1999 was "probably old, and...not related to the acute injury." (TR. 207) Instead, Dr. Frankel concluded that Plaintiff sustained a neck injury as a result of the June 1999 accident and that the initial MRI of the thoracic spine "probably missed the key anatomy in question.  Dr. Anderson seems to agree that the

patient has an acute herniated disc in his cervical spine, but does not relate it to this accident." (Id.) Dr. Frankel further opined that:

> It is medically probable that the condition is permanent, but not stationary and is related to the 6/17/99 accident. I would be inclined to follow Dr. Dunn's recommendation of surgery...The findings of some interosseous weakness at the present time, as well as the sensory changes in the right hand, I believe are significant indication to move ahead with surgery.
> The surgery is necessary in my opinion, and it is not due to prior degenerative changes, but is due to the on-the-job accident of 6/17/99. There will be a permanent impairment assigned following disc surgery and anterior cervical fusion. Nevertheless, the prognosis is excellent that this individual could return to his former work following such a surgery.
> It is not medically probable that at this young age the claimant would have developed these disabling symptoms had there not been an injury such as the one that occurred on 6/17/99.

(Id.) Dr. Frankel also found that Plaintiff presently could not return to his previous work. (Id.)

On July 5, 2000, Dr. Frankel completed a physical capacity form wherein he indicated that Plaintiff: could sit, stand and walk 8 hours in an 8 hour workday; occasionally lift between 11 and 50 pounds; should never lift anything over 51 pounds; needed to change positions frequently; should not drive[7]; could occasionally bend, squat, crawl, twist from the waist, and frequently reach over his shoulder but should not climb; and should not work around unprotected heights or moving machinery. (TR. 358) Dr. Frankel also indicated that Plaintiff was unable to work "now" (Id.)

On October 2, 2001, Plaintiff underwent a group consultation with John Habra, M.D., Richard Pertronella, M.D., and Raymond Schumacher, M.D., which included review of Plaintiff's previous medical records and tests and a physical examination of Plaintiff. (TR.

---

[7]The form provided a list of numbers to circle to indicate the number of hours Plaintiff could perform certain activities such as walking, sitting, standing and driving. Dr. Frankel circled numbers regarding walking, sitting and standing. (TR. 358) Instead of circling a number to indicate the number of hours Plaintiff could drive, Dr. Frankel wrote an "X" next to the word "DRIVE." (Id.) Dr. Frankel's finding that Plaintiff needed to change positions frequently supports the conclusion that the "X" indicates that Plaintiff was restricted from driving.

321-330, 335-336) In addition to relaying information about the June 1999 work accident and his symptoms, Plaintiff informed the doctors that Dr. Prust had given him a series of six epidurals the last of which was last week and that he usually took 4 percocet a day.  (TR. 328) Upon conclusion of their report, the doctors commented that:

> Marked symptoms are described in the absence of significant objective physical or imaging findings.  We consider absence of the right-sided H-reflex to be nondiagnostic.  An extensive course of treatment and a prolonged period of activity restriction has caused no more than slight improvement in the man's subjective symptoms.

(TR. 330) The doctors found no medical evidence of work disability or of need for activity restriction due to any residual consequence of the June 17, 1999 industrial injury.  (TR. 336) Nor was there a medical indication for supportive care.  (Id.)

On September 24, 2002, Dr. Schumacher completed another independent medical evaluation.  (TR. 315) He reviewed Plaintiff's previous records and performed a physical exam.  (TR. 315-320, 331-334) Dr. Schumacher noted that Plaintiff's numbness in his fingers

> is both unexplained and inconsistent.  His pain radiation pattern is not truly typical of a C7 distribution, although an occasional individual with C7 radicular pain will have symptoms limited to interscapular pain.  He certainly does not have pain in the rest of the C7 distribution and there really is no good explanation for all of this right shoulder pain that he is having since there really isn't much question about neural element compression on any objective basis at the C4-5 level or the C5-6 level...The markedly reduced cervical range of motion is not highly consistent from one inclinometric determination to the next and is disproportionate to any evidence of cervical spasm.  The finding of Dr. Prust in February, that of electric shock-like discomfort experienced in the head with occipital triangle palpation, is also not reproduced on today's examination.

(TR. 332-333)

In light of the finding of a normal left H-reflex, Dr. Schumacher questioned Dr. Goodman's conclusion on two occasions that  the absence of the right radial H-reflex was consistent with C6 or C7 radiculopathy.  (TR. 333) Dr. Schumacher referred to a medical text that explained H-reflex abnormality could indicate C6 or C7 radiculopathy, "but this reference does not describe a specificity for this test, in other words, how commonly one might find an absent H-reflex on one side and a present H-reflex on the other side in an

asymptomatic normal individual."  (Id.) The source did indicate that the H-reflex will commonly be abnormal in other diseases of the nervous system that do not include radiculopathy. (Id.) Dr. Schumacher also noted that "[t]he H-reflex, according to my reading, however, is a test of the same reflex loop that produces clinical tendon stretch reflexes, so it remains difficult to reconcile this finding with preservation of upper extremity clinical tendon stretch reflexes on the right side."  (Id.) Dr. Schumacher concluded that Plaintiff's examination revealed "symptoms of overwhelming proportions without substantial correlative objective clinical findings."  (Id.) He did not find that C7 or any other kind of cervical radiculopathy has been demonstrated to exist at the level of reasonable medical probability.  (Id.) He stated that Plaintiff was fully capable of unrestricted work and did not have a permanent impairment of any percentage.  (Id.)

On October 2, 2002, Dr. Schumacher noted that he had spoken to Dr. Goodman and that "[m]y opinion was, before this conversation, and now still remains, that the radial H reflex is too nonspecific to constitute compelling independent evidence of C7 radiculopathy. In other words, if C7 radiculopathy is not medically probable in the absence of having done this test at all, it doesn't become medically probable just because one does the test and then finds unilateral absence of the radial H-reflex."  (TR. 314)

### 3.  State-Agency Non-examining Physician

On July 2, 2001, E.M. Eberling, M.D., completed a Physical Residual Functional Capacity Assessment indicating that Plaintiff could lift up to 50 pounds occasionally and up to 25 pounds frequently; could stand and/or walk about 6 hours in an 8-hour work day; could sit about 6 hours in an 8-hour work day; did not have to periodically alternate between sitting and standing to relieve pain or discomfort; had no limitations in pushing and/or pulling; was limited in reaching in all directions including overhead; should avoid concentrated exposure to hazards such as machinery and heights; could occasionally crawl or climb; and  could frequently balance, stoop, kneel, and crouch. (TR. 246-250) Dr. Eberling further indicated

that "Dr. Mansour is credible and consistent w/ clinical evidence and our assessment." (TR. 252)

C.      Worker's Compensation Award

On June 2, 2003, Plaintiff was awarded worker's compensation for temporary total and/or temporary partial disability for the period June 17, 1999 through May 12, 2002 and compensation for permanent disability since May 12, 2002. (TR. 145-151) The hearing officer found Plaintiff credible and resolved the conflict in the medical evidence by adopting the opinion of Dr. Dunn with regard to diagnosis, causation, and permanent impairment, and by adopting the opinions of Dr. Dunn and Dr. Prust regarding supportive care. (TR. 150) Ultimately, the hearing officer found that Plaintiff "has a C6-7 herniated disc and degenerative condition at that level caused/contributed to/aggravated by this industrial accident. That condition was medically stable as of May 9, 2002 with a 7% permanent impairment and need for supportive care...." (Id.) Plaintiff was directed to make a sincere effort to work. (TR. 151)

D.      Lay Witness Testimony

The record contains letters from Plaintiff's family, a co-worker, and friends relaying that since the June 1999 accident, Plaintiff has been in constant pain, cannot lift or carry any weight, cannot work, cannot sit for long periods, has gained weight due to the nature of his pain, has ceased physical activities he enjoyed such as bowling, golf, baseball, dancing, driving or riding in a car, weight training, and playing with his children (TR. 293-301 )

E.      The ALJ's Findings

1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled under the Act and benefits are denied. *Id.* If the claimant is not engaged in

substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c)), 416.920(c)).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id*.  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id*.  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.   20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[8] to perform past work.   20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.  *Id*. However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying

---

[8]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545.

claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply. *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

     2.    The ALJ's Decision

In his December 10, 2003 Decision, the ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Act on September 29, 1999, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2.    The claimant did not engage in substantial gainful activity from September 29, 1999 through February 10, 2003.

3.    The claimant's impairment which are considered to be "severe" within the meaning of the Social Security Act and Regulations are: pain in the back, neck, and shoulder and obesity.  He does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 CFR 404 Subpart P, Appendix 1.

4.    Although the claimant has underlying medically determinable impairments that could reasonably cause the symptoms alleged, the claimant's allegations as to h [sic] subjective symptoms and associated limitations are not fully credible for the reasons described more fully above [in the body of the decision].

5.    The claimant retains the ability to lift and carry 50 pounds occasionally and 25 pounds frequently.  He is able to sit, stand, and/or walk for about six hours in an 8-hour day.  His ability to climb and crawl is limited to an occasional basis and he has limited ability to reach overhead for objects of more than 50 pounds due to significant right upper extremity pain.   In addition, he should avoid working around hazards such as moving machinery and at unprotected heights.  He has no other exertional or non-exertional limitations.  (20 CFR 404.1545).

6.    The claimant's past relevant work as a telephone room manager, delivery driver, or bartender did not require the performance of work-related activities precluded by the above limitation(s) (20 CFR 404.1565)

7.      The claimant's impairments do not prevent the claimant from performing his past relevant work as a telephone room manager, delivery driver, or bartender.

8.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e)).

### DECISION

It is the decision of the Administrative Law Judge that, based upon the application filed September 29, 2000 (protective filing date), the claimant is not entitled to a period of disability or disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

(TR. 21-22)

In making his decision, the ALJ declined to consider records post-dating the closed period.[9] (TR. 19) Although the ALJ found that Plaintiff produced evidence of an impairment which might give rise to some degree of pain, the ALJ determined that clinical and diagnostic findings appeared to be disproportionate to the alleged intensity, persistence and limiting effects of pain Plaintiff alleged. (TR. 19-20)

In adopting the majority of the state non-examining physician's findings, the ALJ pointed out that such findings were "less restrictive than those of Drs. Mansour and Schumacher.[10] However, giving the benefit of the doubt to the claimant, the undersigned finds this opinion persuasive as they [sic] had available all the medical records and opinions of the treating and consulting physicians." (TR. 21)

## III.    ARGUMENT

Plaintiff contends that the ALJ's decision was not supported by substantial evidence. Plaintiff points out that: the ALJ's decision ignored opinions from treating doctors including Dr. Prust's February 20, 2002 report; the ALJ's decision failed to account for Plaintiff's

---

[9]The closed period specified by Plaintiff is: September 29, 1999 through February 10, 2003. (TR. 95) The ALJ declined to consider records dated after February 9, 2003. (TR. 19)

[10]The state physician's recommendations are actually *more* restrictive than those of Drs. Mansour and Schumacher.

testimony regarding limitations caused by his pain, Plaintiff's failed attempt to work, and that Plaintiff's discharge from the work hardening program confirmed that Plaintiff was unable to work full time during the closed period; and the ALJ's conclusion that Plaintiff could return to his past work as a bartender, delivery driver or telephone room manager is contradicted by Plaintiff's testimony and the ALJ's own RFC finding. Further according to Plaintiff, the ALJ improperly rejected the lay witness statements. Plaintiff also argues that many of Defendant's arguments are post hoc rationalizations for the ALJ's erroneous decision.

Defendant concedes that the ALJ failed to specifically address Dr. Prust's February 20, 2002 finding, but argues that such error was harmless. Defendant also points out that the ALJ's finding was supported by substantial evidence including physical therapy notes reflecting that Plaintiff could perform at a light to medium work category, that Plaintiff's treating physicians as well as several examining physicians indicated that he could return to his work as a sheet metal worker, and that Plaintiff's own physicians as well as a Dr. Schumacher found there was no correlation with Plaintiff's overwhelming symptoms and the objective clinical findings. Further, the *Dictionary of Occupational Titles* supported the ALJ's determination that Plaintiff could return to his previous work as a bartender and the record supports the conclusion that Plaintiff could perform the other jobs identified by the ALJ as they are customarily performed. Defendant also states that the ALJ's determination was consistent with the restrictions mentioned in the lay witness letters and even if the ALJ improperly rejected such evidence, that error is harmless.

## IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 423(d)(1)(A), an insured individual is entitled to disability insurance benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. The Ninth Circuit has stated that "'[a] claimant will be found disabled only if the

impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

Pursuant to 42 U.S.C. §405(g), the findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or nonexamining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Id.* Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Id.*

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Id.* (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

V.    DISCUSSION

A.    Dr. Williams' September 2004 Medical Work Tolerance Recommendations

Plaintiff seeks to supplement the instant record with Dr. Williams' September 15, 2004 Medical Work Tolerance Recommendations (hereinafter "MWTR") for the period September 16, 2002 through October 2, 2002, a memorandum of legal argument, and a copy of the transcript of the November 13, 2003 hearing before the ALJ.  (Plaintiff's Motion to Supplement Transcript)  Plaintiff contends that he submitted the information to the Appeals Council pursuant to the proper procedure and "Defendant failed to include this evidence in the transcript" submitted to the Court.  (Plaintiff's Reply, p.2 *citing* 20 CFR § 404.976)

The Notice of the ALJ's December 10, 2003 decision advised that if Plaintiff sought an appeal, he "should submit any new evidence you wish to the Appeals Council to consider *with* your request for review."  (TR. 12) (emphasis in original)

- 30 -

On January 22, 2004, Plaintiff, through counsel, filed a Request for Review of the ALJ's Decision. (TR. 10) On that same date, Plaintiff's counsel requested the hearing exhibits and hearing transcript tape and requested thirty days after receipt of those materials to file a memorandum in support of the Request for Review together with additional evidence. (TR. 11)

On July 27, 2004, the SSA sent Plaintiff's counsel the exhibits and tapes requested and informed him that any new evidence must be submitted within 25 days: "[w]e will not allow more time to send information except for very good reasons....If we do not hear from you within 25, days, we will assume that you do not want to send us more information. We will then proceed with our action based on the record we have." (TR. 8-9)  On August 16, 2004, within the 25-day deadline, Plaintiff's counsel requested in writing an extension until October 20, 2004 to submit additional argument and evidence.  (Plaintiff's Motion to Supplement Transcript) Plaintiff's counsel received no response to his August 16, 2004 letter.  (Id.)

On September 24, 2004, the Appeals Council issued its decision denying review. (TR. 5) On September 30, 2004, after having received the Appeal Council's September 24, 2004 decision, Plaintiff's counsel informed the Appeals Council in writing that because he did not receive a response to his request for an extension, he had been "under the impression that" he had until October 20, 2004 to submit argument and additional evidence.  (Id.)  He requested until October 20, 2004 to make the submission.  (Id.)  On October 18, 2004, Plaintiff's counsel submitted legal argument and new evidence consisting of Dr. Williams' MWTR and the hearing transcript.  Plaintiff seeks to supplement the record before this Court with the same information.[11]

---

[11]This discussion does not address Plaintiff's attempt to supplement the record with the transcript of the November 13, 2003 hearing given that a hearing transcript is included in the record submitted by Defendant and Plaintiff does not point to any discrepancies between the two transcripts.

The record does not reflect that the Appeals Council responded to Plaintiff's August 16, 2004 or September 30, 2004 correspondence, reconsidered its September 24, 2004 decision in light of the information Plaintiff submitted on October 18, 2004, or issued any other document explaining why the September 24, 2004 decision was not reconsidered in light of such information.  Defendant does not address why the Appeals Council failed to respond to Plaintiff's request for an extension.

Generally, when the Appeals Council has considered additional evidence submitted after the ALJ's decision, the district court will also consider such evidence on review.  *See Ramirez v. Shalala,* 8 F.3d 1449, 1452 (9th Cir. 1993).  Here, however, Plaintiff's additional evidence was submitted after the Appeals Council entered its decision.  Thus, the evidence has not been reviewed by the Appeals Council in the first instance.

Pursuant to regulations regarding review by the Appeals Council:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 CFR § 404.970(b).  Additionally, the regulation governing "[p]rocedures before Appeals Council on review" provides in pertinent part that:

> The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision.

20 CFR § 404.976(b)(1).

Defendant argues that the Court may not consider Dr. Williams' MWTR because Plaintiff has not established that such report is new and material.

Dr. Williams' September 15, 2004 Report was completed after the date of the ALJ's decision and addresses Plaintiff's work tolerance ability from September 16, 2002 to October

2, 2002. Thus, the evidence is new and it relates to the period in question. *See* 20 CFR §§ 404.970(b), 404.976(b)(1).

New evidence is material if it bears directly and substantially on the matter in dispute and if there is a reasonable possibility that the new evidence would have changed the outcome of the determination. *See Booz v. Sec'y of Health & Human Servs.,* 734 F.2d 1378, 1380-81 (9th Cir. 1984). Defendant contends that there is no reasonable possibility that Dr. Williams' MWTR would have changed the outcome of Plaintiff's case because Dr. Williams' findings are based to a large extent on Plaintiff's subjective complaints and are uncorroborated on the record. (Defendants' Statement of Facts, p.17)

The record reflects that Dr. Williams treated Plaintiff in at least September and October 2002 (TR. 308-312) Dr. Williams' September 16, 2002 report includes detailed information from her physical exam of Plaintiff. (TR. 311) Dr. Williams' MWTR indicates that her findings are based upon evaluation of her medical findings in addition to Plaintiff's subjective complaints. (Plaintiff's Motion to Supplement Transcript) Plaintiff points out that Dr. Williams' MWTR is consistent with Dr. Prust's opinion. For reasons discussed *infra,* the ALJ erred with regard to Dr. Prust's opinion and consequently Dr. Prust's opinion should be credited as true. Dr. Williams' finding that Plaintiff was limited to working only four hours per day is consistent with Dr. Prust's opinion. Under these circumstances, there is a reasonable possibility that Dr. Williams' MWTR when considered together with her earlier medical records and the record as a whole, could have changed the outcome of the present case. The Appeals Council should have considered Dr. Williams' MWTR.

B.   The RFC Determination

1.   Introduction

The ALJ's determination herein was made at step four of the disability determination process. "At step four, claimants have the burden of showing that they can no longer perform their past relevant work." *Pinto v. Massanari,* 249 F.3d 840, 844 (9th Cir. 2001) (*citing* 20 CFR §§ 404.1520(e), 416.920(e)). Although the claimant has the burden of proof

at step four, "the ALJ still has a duty to make the requisite factual findings to support his conclusion." *Id. (citing* SSR 82-62)).

To deny disability benefits at step four, the ALJ must find that the claimant is able to perform either the actual functional demands and job duties of a particular past relevant job, or the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Id.* at 845 (*citing* SSR 82-61). "This requires specific findings as to the claimant's residual functional capacity, the physical and mental demands of the past relevant work, and the relation of the residual functional capacity to the past work", i.e., that the claimant's RFC would permit him to return to this past work. *Id.* Further, when determining a claimant's RFC, the "ALJ must consider all relevant evidence in the record including, *inter alia,* medical records, lay evidence, and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006) (*quoting* SSR 96-8p).

Plaintiff argues that the ALJ erred when determining Plaintiff's RFC because the ALJ ignored the treating physicians' opinions, improperly discredited Plaintiff's and lay witnesses' testimony, and improperly concluded that Plaintiff could perform his past work as a telephone room manager, delivery driver or bartender.

### 2.    Physicians' Opinions

Plaintiff contends that the ALJ's RFC determination ignored the treating physicians' opinions.

Plaintiff points out and Defendant concedes that the ALJ did not mention treating Dr. Prust's February 20, 2002 finding that, in addition to certain restrictions, Plaintiff was limited to working four hours per day and could gradually increase to full time status as tolerated. (TR. 353; Plaintiff's MSJ, p.5; Defendant's XMSJ, p.3) Defendant posits that the ALJ was not required to discuss Dr. Prust's specific findings because Dr. Prust's report was consistent with the ALJ's RFC finding and any error was harmless.  (Defendant's XMSJ, p. 3)

Generally, a treating physician's opinion is not necessarily conclusive on either the issue of physical condition or the ultimate issue of disability. *Magallanes,* 881 F.2d at 751. However, the opinion of a treating physician, even when contradicted by other physicians, may be rejected only by specific and legitimate reasons supported by substantial evidence in the record. *Id.; see also Lester v. Chater,* 81 F.3d 821, 833 (9th Cir. 1996). To the extent that other physicians' conflicting opinions rest on independent, objective findings, those opinions could constitute substantial evidence. *Magallanes,* 881 F.2d at 752. Moreover, the ALJ need not discuss evidence that is neither significant nor probative. *See Vincent v. Heckler,* 739 F.2d 1393, 1394-1395 (9th Cir. 1984).

Defendant's position that Dr. Prust's opinion "is not inconsistent with the ALJ's RFC finding" is untenable. Dr. Prust's finding that as of February 20, 2002 Plaintiff could work only four hours per day with certain limitations[12] is inconsistent with and contradicts the ALJ's conclusion that Plaintiff could sustain a full 8-hour day during the entire closed period. Further, Defendant's attempt to undermine Dr. Prust's report as based on Plaintiff's subjective beliefs is also unsupported by the record given that Dr. Prust, who had been treating Plaintiff since December 2000, based his February 20, 2002 opinion on his independent physical and neurologic examination and review of medical records including the most recent MRI and EMG results. (TR. 351) Dr. Prust was not the only doctor who opined that Plaintiff was unable to work full time during the closed period: examining Dr. Frankel was of the opinion that Plaintiff was unable to work at least at some point during the closed period when he indicated in July 2000 that Plaintiff was unable to work "now."[13] (TR. 358) On this record, treating Dr. Prust's February 20, 2002 opinion regarding Plaintiff's ability to work is significant and probative evidence. These same reasons  undercut

---

[12]Dr. Prust also incorporated previously identified medical work tolerance limitations into his February 20, 2002 report. (*See* TR. 352-353)

[13]Dr. Frankel's report indicates the RFC that Plaintiff would be able to achieve sometime in the future. (TR. 358)

Defendant's argument that the ALJ's failure "to discuss Dr. Prust's opinion is a harmless error and no cause for remand." (Defendant's XMSJ, p. 3) *See Robbins,* 466 F.3d at 885 (recognizing that the Ninth Circuit has applied harmless error in the social security context where the ALJ's error was inconsequential to the ultimate determination that the claimant was not disabled) (citations omitted). The conclusion that the ALJ's failure "to discuss Dr. Prust's opinion..." (Defendant's XMSJ, p. 3) is not harmless error is especially appropriate in this case in light of Ninth Circuit precedent that when an ALJ fails to provide adequate reasons for rejecting the opinion of a treating physician, "we credit that opinion as a matter of law." *Lester,* 81 F.3d at 834 (citation omitted). *See Widmark v. Barnhart,* 454 F.3d 1063, 1069 n.4 (9th Cir. 2006) (denying Commissioner's harmless error argument where ALJ failed to establish sufficient reasons for rejecting doctor's opinion, court credited that opinion, and the ALJ's error in rejecting that opinion ultimately led to an adverse disability finding).

Defendant maintains that the ALJ necessarily considered Dr. Prust's February 20, 2002 opinion when the ALJ read Dr. Schumacher's report which included a summary of Dr. Prust's opinion. In addition to summarizing Dr. Prust's report, Dr. Schumacher noted that "[t]he finding of Dr. Prust in February, that of electric shock-like discomfort experienced in the head with occipital triangle palpation, is also not reproduced on todays' examination." (TR. 317, 333) However, the ALJ ultimately rejected Dr. Schumacher's conclusion that Plaintiff could perform unrestricted work. Instead, the ALJ accepted non-examining physician Dr. Eberling's restrictions which resulted in the finding, contrary to Dr. Schumacher's opinion, that Plaintiff could not return to his past work as a sheet metal worker. Under these circumstances, the fact that the ALJ read Dr. Schumacher's report which summarized the entire medical record up to September 2002, including Dr. Prust's report, does not suffice to establish the grounds upon which the ALJ attributed greater weight to non-examining physician Dr. Eberling's findings over treating Dr. Prust's findings in arriving at an RFC determination.

It is unclear on the instant record how the ALJ arrived at the RFC he attributed to Plaintiff for the closed period.  The ALJ adopted most, but not all, of non-examining agency physician Dr. Eberling's July 2001 restrictions.  Without explanation, the ALJ declined to accept Dr. Eberling's finding that Plaintiff was limited when reaching in all directions including overhead. (TR. 249)  Instead, the ALJ found that Plaintiff was limited only when reaching overhead for objects weighing more than 50 pounds.  (TR. 22)

Assessment of Plaintiff's RFC herein was no easy task for the ALJ given the diverse opinions of record as to diagnosis and Plaintiff's ability to perform his previous work, some other work, or work at all during the closed period. Adoption of Dr. Eberling's RFC recommendation seems to be a compromise from among several RFC recommendations of record ranging from findings that Plaintiff was unable to work full-time at least during some points of the closed period (Dr. Prust, Dr. Frankel) to findings that Plaintiff could work subject to some restrictions (Dr. Dunn, Dr. Eberling[14]) to findings that Plaintiff could return to his previous work as a sheet metal worker with absolutely no restrictions  (Dr. Mansour,[15] Dr. Anderson, Dr. Schumacher and the independent group).   The ALJ is required to set forth sufficient findings to support his RFC determination.  *See Pinto,* 249 F.3d 840.

In attributing greater weight to the majority of Dr. Eberling's RFC determination, the ALJ noted:

---

[14]Dr. Prust's and Dr. Frankel's findings suggest Plaintiff would be able to eventually return to full time, restricted work.  The question was left open as to when this would occur.

[15]Dr. Mansour's records are somewhat contradictory.  (*Compare* TR. 237 (February 1, 2000 finding that Plaintiff could not perform his normal work activities from February 1, 2000 to March 1, 2000) *with* TR. 232-233 (November 16, 2000 finding that Plaintiff had no lifting restrictions and could stand, walk and/or sit about 6 hours from some illegible point in 1999 through June 5, 2000))

•      Dr. Mansour's "March 2001"[16] release of Plaintiff to his normal activities and Dr. Mansour's later finding that Plaintiff had no lifting or carrying restrictions and could sit, stand, and/or walk for 6 hours in an 8-hour work day;

•      Dr. Frankel's finding that Plaintiff could not return to his previous work as a sheet metal worker; and

•      Dr. Schumacher's conclusion that Plaintiff was fully capable of unrestricted work.

The ALJ stated that Dr. Eberling's recommendations were more restrictive than Dr. Mansour's and Dr. Schumacher's and that the ALJ, "giving the benefit of the doubt to the claimant,... finds this opinion persuasive as [Dr. Eberling] had available all the medical records and opinions of the treating and consulting physicians." (TR. 21) However, Dr. Eberling's July 2001 finding pre-dated Dr. Prust's February 20, 2002 opinion. Although the opinions of examining Dr. Schumacher and treating Dr. Mansour that Plaintiff could return to unrestricted work are relevant, those opinions do not shed any light on the RFC that the ALJ ultimately assessed. The ALJ set forth no explanation for accepting Dr. Eberling's July 2001 finding over treating Dr. Prust's February 20, 2002 finding or treating Dr. Dunn's November 16, 2000 recommended work restrictions (*See* TR. 342 Dr. Dunn's opinion that Plaintiff is "not at a medium, medium-heavy, or very heavy-duty job" level, can lift up to 20 pounds occasionally and 10 pounds frequently, and is not restricted regarding walking, standing, sitting, pushing, pulling, or using arm controls); discounting examining Dr. Frankel's other recommendations including that Plaintiff should not drive, which is relevant to the ALJ's subsequent finding that Plaintiff could work as a delivery driver; or for rejecting Dr. Eberling's finding that Plaintiff was limited when reaching in all directions which would

_____

[16]It appears that the ALJ is referring to Dr. Mansour's February 1, *2000* opinion that Plaintiff could not return to normal work activities until March 1, 2000. (TR. 237; *see also* TR. 16 where ALJ stated: "Dr. Mansour...released him to his normal activities on March 1, 2000")).

most likely affect the ALJ's subsequent findings regarding Plaintiff's ability to perform past work as a bartender, delivery man or telephone room manager.[17]

Because the ALJ failed to provide "legally sufficient reasons for rejecting" Dr. Prust's February 20, 2002 findings, that opinion is credited as true.    *Benecke v, Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004); *see also Lester,* 81 F.3d at 834.  Dr. Prust found that as of February 20, 2002, Plaintiff could work only 4 hours per day.[18]  An inability to work full time requires a finding of disability.  *See e.g., Reddick,* 157 F.3d at 729-730 (remanding for an award of benefits where, *inter alia,* the plaintiff was unable to work a full work week); SSR 96-8p (assessment of RFC includes consideration of an individual's ability to perform sustained activities eight hours a day, for five days a week, or an equivalent work schedule).

However, Plaintiff requests disability for the closed period from September 29, 1999 to February 10, 2003.  In his February 20, 2002 report, Dr. Prust anticipated that Plaintiff should eventually be able to work full time.[19]  Although crediting Dr. Prust's opinion as true entitles Plaintiff to benefits through February 20, 2002, it remains unclear on this record whether Plaintiff remained disabled, as defined by the SSA, through February 10, 2003.

### 3.    Plaintiff's Credibility

An ALJ's RFC determination must take into account, among other evidence, Plaintiff's symptoms, including pain, that are reasonably attributed to a medically

---

[17]For example, *The Dictionary of Occupational Titles* indicates that bartending involves frequent reaching.  (Defendant's XMSJ, Ex. A)

[18]Dr. Prust indicated that he had identified other restrictions in addition to his recommendation that Plaintiff should start out working only 4 hours per day and he incorporated those restrictions into his February 20, 2002 opinion. (TR. 352-353)  Neither party directs the Court to such restrictions.  Defendant does not suggest that Plaintiff's ability to perform 4 hours of work at the level identified by Dr. Prust could result in a finding that Plaintiff could work  a full work day at a lighter level.  Dr. Prust's precise restrictions are not necessary to fully credit his finding.

[19]Because other restrictions identified by Dr. Prust do not appear in the record, it is unclear what level of work Dr. Prust anticipated Plaintiff would be able to perform full time.

determinable impairment. *Robbins,* 466 F.3d at 883. "When giving such consideration, if the record establishes the existence of a medically determinable impairment that could reasonably give rise to the reported symptoms, an ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect." *Id.* (citation omitted).

Once the claimant produces objective medical evidence of an underlying impairment, the ALJ may not reject the claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of the pain. *See Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996); SSR 96-7P. Nor may the ALJ reject subjective testimony simply because there is no showing that the impairment can reasonably produce the degree of symptoms alleged. *Id.*

Where the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing. *Robbins,* 466 F.3d at 883. Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen,* 80 F.3d at 1284. In assessing the claimant's credibility, the ALJ may consider: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; (5) observations of treating and examining physicians and other third parties; (6) precipitating and aggravating factors; and (7) functional restrictions caused by the symptoms. *Id.* at 1284. *See also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or internal contradictions in that testimony.")

The ALJ herein determined that Plaintiff "does have a medically determinable impairment which could reasonably be expected to produce [his]...subjective symptoms." (TR. 19) Specifically, the ALJ found that Plaintiff's "impairments, which are considered to be 'severe' within the meaning of the Social Security Act are: pain in the back, neck, and shoulder and obesity." (TR. 21) However, the ALJ rejected Plaintiff's testimony regarding "the alleged intensity, persistence, and limiting effects of" his pain (TR. 19) citing: (1) the determination that Plaintiff was not a surgical candidate; (2) clinical and diagnostic findings and physician comments; (3) no evidence of weight loss or atrophy; and (4) Plaintiff's daily activities. Plaintiff specifically takes issue with the last two items.

a.    Surgery

Initially, both treating Doctors Dunn and Prust and examining Dr. Frankel believed that Plaintiff could be a surgical candidate. Additionally, despite the ALJ's statement that in June 2000, "Dr. Goldfarb was reluctant to recommend surgery based on the MRI scan..." (TR. 17), Dr. Goldfarb also stated in that same report that he was not ruling out surgery completely. (TR. 209) Nonetheless, the ALJ is correct that by September 2000, Dr. Dunn "recommended epidural injections and felt surgical intervention would not likely improve his condition." (TR. 17; *see also* TR. 340 (on August 28, 2001 Dr. Dunn did not think surgery would be beneficial.)) Thereafter, Plaintiff pursued courses of cervical steroid epidural injections with Dr. Prust and, later, Dr. Glacy. (TR. 268-273) Although the ALJ attempted to use the decision against surgery to support his position that Plaintiff's condition was not poor enough to merit surgery, the fact remains that Plaintiff's doctors continued to treat him for pain and Plaintiff underwent an alternatively invasive treatment for pain through at least 2003 (TR. 268-273, 282-283). That cervical steroid epidural injections, instead of surgery, were the better course for Plaintiff does not clearly and convincingly undermine his pain testimony. Moreover, Plaintiff clearly followed this prescribed course of treatment.

- 41 -

b.      Clinical and Diagnostic Findings and Physician Comments

The ALJ stated that Dr. Schumacher could not find a "good explanation" for Plaintiff's right shoulder pain; Plaintiff's most recent exams remained nonorganic; and Dr. Lieberman "noted that he had a hard time assigning a specific organic pain generator."  (TR. 19) The ALJ also cited MRIs and EMG/nerve conduction studies.

The ALJ stated that "there are repeated indications by his treating and examining physicians that [Plaintiff] was either exaggerating his symptoms and/or that he was not really trying to perform the routine tests required of him."  (TR. 20)   The ALJ cites Dr. Dunn's notes  reflecting that in January 2000, Plaintiff had  "tenderness and a lot of pain, subjective complaints,..." (TR. 230); July 2000, Plaintiff "is complaining of pain and the right leg goes numb.  I am not sure where that comes from.  I do not see evidence in his cervical spine to cause that problem, and he has knee and ankle reflexes without clonus, weakness, or any objective sensory deficit."[20] (TR. 216 (also noting that Plaintiff "[c]ertainly...has a radiculopathy")); September 2000, Plaintiff "continues to have severe pain; however, I cannot find a significant deficit at this point in time" (TR. 215); and June 2001, Plaintiff had "a give-way motor examination" and that Dr. Dunn was "a little suspicious of his behavior because of the extreme pain...if he continues to have give-way weakness, we will give him a fairly normal rating."  (TR. 341) The ALJ also cited the independent medical group's observation that "[m]arked symptoms are described in the absence of significant objective physical or imaging findings."  (TR. 330)

Because the ALJ has found that Plaintiff suffers from severe impairments (*see* TR. 19, 21) the ALJ may not reject Plaintiff's credibility solely because the degree of pain alleged is not substantiated by the objective medical evidence.  *See Reddick,* 157 F.3d at 722 ("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may

---

[20]Dr. Dunn's statement could be read to suggest that he sees no evidence in the cervical spine to cause Plaintiff's complaint of numbness in his right leg.

not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." ); *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986) ("'Excess pain' is by definition pain that is unsupported by objective medical findings."); SSR 96-7P ("Symptoms cannot be measured objectively through clinical or laboratory diagnostic techniques..."). Instead, "the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence." SSR 96-7P.; *see also Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and disabling effects. 20 CFR § 404.1529(c)(2)"). Additionally, the ALJ properly considered Dr. Dunn's suspicions about Plaintiff's behavior and observation of "give-way weakness." Nonetheless, Dr. Dunn never retreated from his opinion that Plaintiff had C6 radiculopathy.[21] (TR. 339 (October, 2001))

<u>c.    Atrophy and Weight Loss</u>

The ALJ discounted Plaintiff's credibility because there was no evidence of weight loss and diffuse muscle atrophy which, according to the ALJ, are common side effects of prolonged and/or chronic pervasive pain. (TR. 20) The parties disagree whether it was error for the ALJ to reject Plaintiff's credibility on this ground.

Defendant is correct that the Ninth Circuit has affirmed a denial of benefits where the plaintiff alleged she must maintain in a fetal position all day because of constant pain, yet she exhibited no physical signs, including muscular atrophy, of a totally incapacitated person.

---

[21]Further, Dr. Dunn's earlier notes indicated that this condition explained Plaintiff's pain symptoms. (TR. 227 (in February 2000 Dr. Dunn stated that Plaintiff "has a herniated disc at C6-7 on the right side that is giving him a lot of his complaints, mainly pain in the right neck radiating to the right shoulder."); TR. 225 (in June 2000, Dr. Dunn wrote that Plaintiff's herniated disc "explains his symptoms."))

(Defendant's XMSJ, p. 6 *citing Meanel v. Apfel,* 172 F.3d 1111, 1115 (9th Cir. 1999)).  The instant case is distinguishable from *Meanel*.   Plaintiff did not claim to be totally incapacitated.  He attended several courses of physical therapy, including a work hardening program, throughout the closed period.  There is no basis on this record to disbelieve Plaintiff because he did not exhibit muscle atrophy.

Nor should Plaintiff be disbelieved because he did not lose weight.  No evidence of record supports the conclusion that Plaintiff's impairments would have resulted in weight loss.[22]  In the same manner that the ALJ points to lack of weight loss to support his findings, so could Plaintiff's 40-to-48-pound weight gain after his injury be interpreted to support Plaintiff's claim that he was less active and more limited because of his impairments and resultant symptoms.   This record does not support the ALJ's findings regarding lack of muscle atrophy and weight loss.

### d.      Plaintiff's Activities

Plaintiff contends that the ALJ misstated the evidence when finding that Plaintiff's activities did not support the claimed severity of pain.   The ALJ found that Plaintiff could perform activities such as personal hygiene and grooming, driving, shopping, light household chores, and talking on the phone. (TR. 20) "It can thus be inferred that he has maintained a somewhat normal level of daily activity and interaction."  (TR. 20)  The ALJ did not acknowledge, and therefore did not specifically discount, Plaintiff's claim that his ability to perform the activities was limited.  For example, Plaintiff testified that he had difficulty reaching up to shampoo and extending his arms outward, he could not drive for long periods at a time and turning his head to look for traffic exacerbated his pain, he could not stand or sit for long periods of time, twisting to wash in the shower exacerbated his pain, and he had difficulty carrying a lot of groceries at one time.  (TR. 53, 128-130, 142) Despite Plaintiff's

---

[22]The record reflects that between September 1999 and January 2000, Plaintiff gained approximately 40 to 48 pounds (TR. 229, 242) and later sustained a 50 pound weight loss due to dieting.  (TR. 274)

alleged limitations, the ALJ "noted that the physical and mental requirements of these household tasks and social interactions are consistent with a significant degree of overall functioning." (TR. 20)

It is well-settled that engaging in normal life activities is not necessarily inconsistent with a finding of disability. *See Reddick,* 157 F.3d at 722 (citation omitted). "Only if the level of activity were inconsistent with [c]laimant's claimed limitations would these activities have any bearing on [c]laimant's credibility." *Id.* Thus, if a claimant is capable of performing activities "that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989). In contrast, where the claimant's activity is in harmony with his disability, the activity does not necessarily indicate an ability to work. *See Reddick,* 157 F.3d at 722. The ALJ's findings must be supported by specific, cogent reasons. *Id.* (citation omitted) The ALJ's statement that Plaintiff has a "significant degree of overall functioning" (TR. 20) does not fairly characterize Plaintiff's ability to perform the activities discussed and does not set out specific, cogent reasons for reaching such conclusion. *Id.* ("the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.")

### 4.    Lay Testimony

Lay testimony is also relevant to the RFC determination. See *Robbins*, 466 F.3d at 883. The ALJ's consideration of lay testimony is especially important when a plaintiff alleges a greater level of severity of pain than can be shown by the objective medical evidence. *See* SSR 96-7P (in assessing excess pain allegations, the ALJ should consider statements from other persons about the plaintiff's daily activities and how the symptoms affect the plaintiff's ability to work). "[T]he ALJ can reject the testimony of lay witnesses only if he gives reasons germane to each witness whose testimony he rejects." *Smolen,* 80 F.3d at 1288.

- 45 -

In rejecting the lay testimony submitted herein, the ALJ acknowledged that such testimony primarily concerned Plaintiff's functional limitations caused by his impairments. (TR. 20) However, the ALJ found these statements "less persuasive than the abundance of objective medical evidence." (TR. 20)  It is difficult to assess from the ALJ's conclusory statement why he did not find the lay testimony persuasive.  *Compare Smolen,* 80 F.3d at 1289 (interpreting predecessor to SSR 96-7P and finding fault with the ALJ's disregard of lay testimony because such testimony was not corroborated by the objective medical evidence), *with Lewis v. Apfel,* 236 F.3d 502, 511 (9th Cir. 2001) ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence.")

> 5.    Plaintiff's ability to perform past work as a telephone room manager, delivery driver, or bartender

Plaintiff argues that even accepting the ALJ's RFC determination, the substantial evidence in the record does not support the conclusion that he could have performed the jobs of telephone room manager, delivery driver, or bartender.

Plaintiff must be able to perform either the "actual functional demands and job duties of a particular past relevant job" or "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." *Pinto,* 249 F.3d at 845.  The ALJ should "first consider past work as actually performed, and then as usually performed." *Id.* (citation omitted) When considering work as generally performed, reference to the *Dictionary of Occupational Titles* is appropriate. *Id.* at  845-846.  ("we begin by observing that the best source for how a job is generally performed is usually the *Dictionary of Occupational Titles*.")

The ALJ found that Plaintiff's past relevant work as a telephone room manager, delivery driver, or bartender did not require performance of work-related activities precluded by the RFC attributed herein. (TR. 22) The ALJ made no other findings about Plaintiff's past work including specific responsibilities of a bartender, delivery driver or telephone room manager as actually performed.  Nor did he make specific findings regarding how those jobs

are generally performed in the national economy.   The Ninth Circuit has commented upon the difficulty "for the reviewing court where sufficient findings are not made" to support the conclusion that the claimant can perform past relevant work.  *Id.* at 845.   Because remand is appropriate in this case as discussed *infra* there is no need to determine at this point whether the ALJ's conclusion was adequately supported.   However, on remand, the ALJ should be mindful of the necessity of making appropriate findings at each step of the sequential disability determination process.  *See id.*

C.     Conclusion

Plaintiff requests that the Court remand the matter for an immediate award of benefits. Remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted).   Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester,* 81 F.3d at 834.   As discussed above, the ALJ failed to set forth legally sufficient reasons for rejecting Dr. Prust's February 20, 2002 finding.  The record is complete and there are no outstanding issues that must be resolved before a disability finding through February 20, 2002 can be made. *See supra*, pp. 34-39.  Because the ALJ failed to provide adequate reason for rejecting the opinion of Plaintiff's treating physician and because Plaintiff has satisfied all three factors in favor of remand for an award of benefits for the period from September 29, 1999 through February 20, 2002, remanding for further administrative proceedings concerning this period "would serve no useful purpose and would unnecessarily extend...[Plaintiff's] wait for benefits." *Benecke*, 379 F.3d at 595.  *See also Regennitter v. Commissioner,* 166 F.3d 1294, 1300 (9th Cir. 1999) (where the court "conclude[s] that...a doctor's opinion should have been credited and, if credited, would have led to a finding of

eligibility, we may order the payment of benefits.");  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990) (remanding for payment of benefits where the Secretary did not provide adequate reasons for disregarding examining physician's opinion);  *Winans,* 853 F.2d at 647 (same).   Therefore, Plaintiff's Motion for Summary Judgment should be granted in part to the extent that this matter should be remanded for an award of benefits for the period beginning September 29, 1999 through February 20, 2002.

However, the case should also be remanded for further proceedings to determine whether Plaintiff is entitled to benefits for the remainder of the closed period, *i.e.* from February 21, 2002 through February 10, 2003.   Dr. Prust was of the opinion that Plaintiff could eventually return to full time work as tolerated.   It may well be that Plaintiff would have been able to return to work before February 10, 2003.   Although Dr. Williams opined that Plaintiff met disability requirements through October 2, 2002, her MWTR was not submitted to the ALJ.   The Ninth Circuit has been reluctant to remand for an award of benefits "on the basis of evidence that the ALJ has had no opportunity to evaluate.   The appropriate remedy in this situation is to remand this case to the ALJ; the ALJ may then consider" Dr. William's MWTR together with evidence of record and any additional testimony that may be received upon remand necessary to determine whether Plaintiff's disability status continued from February 21, 2002 through February 10, 2003 and to make any other findings at step four and, if necessary, step five if necessary.   *Harmon* v. *Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000).

Remand is also necessary to assess Plaintiff's allegations of disabling pain during the remainder of the closed period.   *See Connett,* 340 F.3d at 876 (recognizing that the court is not required to credit pain testimony and instead remanding for reconsideration of plaintiff's credibility); *Bunnell v. Barnhart,* 336 F.3d 1112, 1115-1116 (9th Cir. 2003) (remanding where outstanding issues, including ALJ's reassessment of plaintiff's credibility, must be resolved before a disability determination can be made).   Remand is especially appropriate in this case given that other outstanding issues remain and  Plaintiff's pain testimony, even

if credited, may not necessarily establish he was disabled for the remainder of the closed period. *See id.*

The record is not sufficiently developed concerning whether Plaintiff could perform previous work as actually performed or generally performed.  When the medical and other evidence is re-evaluated on remand, it may well be that Plaintiff could have or could not have performed his previous work. In either case, the record requires further development concerning the defining requirements of any past work at step four and/or other work, if any, that Plaintiff could perform if the analysis proceeds to step five.

Upon remand, the ALJ should consider all the evidence in the record, including Dr. Williams' MWTR; make appropriate findings concerning Plaintiff's credibility and lay testimony; and where appropriate, supplement the record with additional evidence.

## VI.    RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court grant Plaintiff's Motion to Supplement the Record (Doc. No. 10) and  grant in part and deny in part Plaintiff's Motion for Summary Judgment (Doc. No. 11).  Plaintiff's Motion for Summary Judgment should be granted to the extent that the Magistrate Judge recommends that this matter be remanded for an award of benefits for the period from September 29, 1999 through February 20, 2002.  Plaintiff's Motion for Summary Judgment should be denied to the extent that the Magistrate Judge recommends that this matter be remanded for a determination as to whether Plaintiff is entitled to benefits for the period from February 21, 2002 through February 10, 2003 as discussed within the body of this Report and Recommendation.

The Magistrate Judge further recommends that the District Court deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 12).

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: CV 04-643-TUC-RCC.  A party

may respond to another party's objection within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 10th day of July, 2007.


_____
Héctor C. Estrada
United States Magistrate Judge

- 50 -